## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **SABRE ENERGY CORPORATION**, | **Case No. 2:19-cv-5559** |
| Plaintiff, | |
| **v.** | **Judge Graham** |
| **GULFPORT ENERGY CORPORATION, et al.,** | **Magistrate Judge Deavers** |
| Defendants. | |

## OPINION AND ORDER

This breach-of-contract case is brought by Sabre Energy Corporation ("Sabre"), who holds fractional interests in two oil and gas lessee's shares of royalties, commonly known as overriding royalty interests or ORRIs. Plaintiff claims that these two lessees, Gulfport Energy Corporation ("Gulfport") and Antero Resources Corporation ("Antero") (collectively "Defendants"), owe it royalties on oil and gas produced by their deep horizontal wells. Defendants disagree, contending that Plaintiff's ORRIs are limited to the oil and gas produced by the vertical shallow wells which existed at the time of the assignment of the ORRIs.

This matter is now before the Court on cross-motions for summary judgment, Doc. 64, 67, and 72. For the reasons that follow, the Court concludes that Plaintiff has no interest in the oil and gas produced by Defendants' deep horizontal wells.

### I.     Background

#### A.  Factual Background

Plaintiff obtained its ORRIs through two assignments (collectively the "Assignments") in 1993 from the Transatlantic Energy Corp., Defendants' predecessor in interest to the oil and gas leases. Doc. 1-1; Doc. 1-2. Each Assignment contains an "Exhibit A". Doc. 1-1 at 2; Doc. 1-2 at

2. The Exhibits list a combined total of 25 wells by name and specify for each the overriding royalty interest percentage, drilling permit number, and location (section, township, and county). Doc. 1-1 at 2; Doc. 1-2 at 2. At the end of the Assignments is a "note" which provides:

> THIS ASSIGNMENT OF OVERRIDING ROYALTY INTEREST PERTAINS TO THE AFOREMENTIONED WELLS AND THE DRILLING UNITS ASSOCIATED THEREWITH AND DOES NOT EXTEND TO THE UNDRILLED ACREAGE ASSOCIATED WITH THE LEASE REFERENCED AND/OR POOLING AGREEMENT.

Doc. 1-1 at 2; Doc. 1-2 at 2.

The 25 referenced wells are "vertical shallow wells," a type of well commonplace in 1993. *See* THE FACTS ABOUT HYDRAULIC FRACTURING, The Ohio Department of Natural Resources, available at https://ohiodnr.gov/static/documents/oil-gas/factsheet/hydraulic-fracturing_0815.pdf. The vertical shallow wells at issue produced oil and gas from depths of 2,500 to 5,550 feet. *See* Doc. 47-1; Doc. 48-2; Doc. 67-1.

The oil and gas industry has experienced tremendous advancements since the assignment of ORRIs in 1993. Between 2010-2011, a new method of drilling began in Ohio by which horizontal deep wells became capable of producing from a geological formation known as the Utica Shale/Point Pleasant formation. *See* Horizontal Wells, Ohio Department of Natural Resources, available at https://ohiodnr.gov/business-and-industry/energy-resources/oil-and-gas-wells/horizontal-wells;

*THE FACTS ABOUT HYDRAULIC FRACTURING, The Ohio Department of Natural Resources, available at https://ohiodnr.gov/static/documents/oil-gas/factsheet/hydraulic-fracturing_0815.pdf.*

Defendants have drilled horizontal deep wells to produce oil and gas from the Utica Shale/Point Pleasant formation. Some of these horizontal deep wells produce from underneath the

vertical shallow wells and drilling units on which Plaintiff has ORRIs.[1] Plaintiff believes its ORRIs attach to all the oil and gas within the drilling units, including in the Utica Shale/Point Pleasant formation. It has demanded royalty payments from Defendants. Defendants refused Plaintiff's demand, contending that the ORRIs do not include wells drilled to the depth of the Utica Shale/Point Pleasant formation. *See* Doc. 1-4; Doc. 1-5.

### B. Procedural Background

On December 20, 2019, Plaintiff filed a complaint asserting three claims: (1) breach of contract, (2) accounting, and (3) declaratory judgment. Doc. 1. Following a stay while Gulfport underwent bankruptcy, the Court dismissed Plaintiff's claim for accounting. Doc. 20.

This action was most recently before the Court on cross-motions for judgment on the pleadings. The Court made preliminary findings on the legal issues presented and denied the cross-motions, concluding that questions of fact remained. Doc. 62 at 5. The parties then filed motions for summary judgment and provided additional information and arguments. Docs. 64, 67, and 72. Upon consideration of these arguments, the Court rescinded its Opinion and Order on the motions for judgment on the pleadings, found those motions mooted by the motions for summary judgment,

---

[1] Gulfport has horizontal deep wells that go underneath the following vertical shallow wells on which Plaintiff has ORRIs: K. Lydick #2 (API No. 34111236840000); C. McQueen #3 (API No. 34111236810000); J. D. Anderson #2 (API No. 34121237050000); Carpenter #1 (API No. 34121238730000); Martin #1 (API No. 34121238320000); A. Miller #1 (API No. 34121238360000); and Neuhart #2 (API No. 34121238480000). McCoy Affidavit, Doc. 64-1, ¶ 3.

Antero has horizontal deep wells that go underneath the following vertical shallow wells on which Plaintiff has ORRIs: L. Stephens #1 (API No. 34121238720000); R. Craft #1 (API No. 34111236830000); Elbert #1 (API No. 34111236820000); A. Miller #1 (API No. 34121238360000); Froehlich #1 (API No. 34121238370000); Papich #1 (API No. 34121238400000); L. Hothem #1 (API No. 34111236580000); L. Hothem #2 (API No. 34111236590000); and L. Hothem #3 (API No. 34013205610000). Ellis Affidavit, Doc. 72-1, ¶ 8.

and scheduled oral argument. Doc. 92. Oral argument was held on June 27, 2023. Doc. 95. This matter is ripe for review.

## II.    Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of showing the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379

(6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## B. Rules of Contract Interpretation

In Ohio, ORRI assignments are interpreted using the general rules of contract interpretation. *Sound Energy Co. v. Res. - Utica, LLC*, No. 2:18-cv-1771, 2021 WL 1102483, at *7 (S.D. Ohio Mar. 23, 2021) (citation omitted). These rules are applied for one purpose: to bring effect to the parties' intent. *Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (Ohio 2020). The starting point of determining the parties' intent lies in the words of the contract. *Kelly v. Medical Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987) ("The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.") (citation omitted).

"Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys v. Auglaize Cty. Bd.*, 875 N.E.2d 561, 566 (Ohio 2007). Common words are to be given "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."

5

*Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (internal quotation marks and citation omitted). Technical words are to be given their technical meaning unless a different intention is clearly expressed. *Id.* (citation omitted). Where the terms of a contract are ambiguous, extrinsic evidence may be used to determine the parties' intent. *Maverick Oil & Gas, Inc. v. Barberton City Sch. Dist. Bd. of Edn.*, 872 N.E.2d 322, 328 (2007).

Contracts must be interpreted with context in mind. One provision should not be interpreted in a way that renders another superfluous or meaningless. *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 651-52 (Ohio 2014) (citation omitted); W*ilkerson v. Am. Fam. Ins. Co.*, No. 1:19CV2425, 2020 WL 5891971, at *3 (N.D. Ohio Oct. 5, 2020). And a rule of contract interpretation should not be applied if doing so would produce absurd results, such that the parties are very unlikely to have agreed. *Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (2020).

### III. Analysis

The crux of this dispute is whether Plaintiff's ORRIs attach to the oil and gas Defendants are producing from the Utica Shale/Point Pleasant formation. Resolution depends on the meaning of the Assignments which granted Plaintiff ORRIs. The Assignments provide:

> This assignment of net revenue interest pertains to the aforementioned wells and the drilling units associated therewith and does not extend to the undrilled acreage associated with the lease referenced and/or pooling agreement.

Doc. 1-1 at 2; Doc. 1-2 at 2. This plain language grants ORRIs in "the aforementioned wells and the drilling units associated therewith" and it plainly excludes the "undrilled acreage associated with the lease referenced and/or pooling agreements."

## A. Drilling Unit

As an initial matter, the Court finds that the phrase drilling unit must mean something more than the shallow vertical wellbores. To conclude otherwise would frustrate the intent of the contracting parties. The Court looks to the text of a contract to determine the parties' intent. *See Kelly*, 509 N.E.2d at 413. The contracting parties to the Assignments made the deliberate choice to grant ORRIs in both wells and their associated drilling units. If the associated drilling units were limited to the wellbores, its inclusion would add nothing to the grant of ORRIs in wells. Interpretations such as this, which render a provision meaningless, are disfavored. *See Transtar Elec., Inc.*, 16 N.E.3d at 651-52.

Drilling unit is not common parlance, it is a technical term used in the oil and gas industry. The parties dispute its technical meaning. Defendants argue that drilling unit is a legal term of art and its definition is controlled by Ohio law. Plaintiff refutes that Ohio law is controlling and instead urges the Court to apply the common meaning it has gained in the oil and gas industry.

Defendant's position is persuasive. Drilling unit is a concept created by Ohio law to require that wells meet certain spacing requirements. *See* Ohio Rev. Code § 1509.01(G); Ohio Admin Code 1501:9-1-04. Prior to drilling a well, an oil and gas producer must obtain a drilling permit. Ohio Rev. Code § 1509.05 (No person shall drill a new well . . . without having a permit to do so . . . ."). A drilling permit will be issued only if the proposed well will be placed on an adequate drilling unit. Ohio Admin. Code 1501:9-1-04(C). Indeed, Ohio law defines drilling unit as the "minimum acreage on which one well may be drilled." Ohio Rev. Code § 1509.01(G). The parties to the Assignments were sophisticated oil and gas companies. It is reasonable to conclude that they knew and understood the legal concept of drilling unit and relied on that understanding when referring to drilling units in the Assignments.

Plaintiff's alternative technical definition is less persuasive. Plaintiff asserts that the phrase drilling unit is used as shorthand to refer to an area of land. While possible, Plaintiff offers no support that the oil and gas industry uses the phrase drilling unit in this way. Furthermore, were drilling unit a shorthand to refer to land in assignments, the Court would expect that other disputed assignments would use the phrase in this way. Yet neither the parties nor the Court could find a single instance of an oil and gas assignment using the phrase drilling unit to refer to an area of land.

The Court concludes that the Assignment's reference to drilling unit means the concept of drilling unit created by Ohio law. Drilling units have inherent limitations under Ohio law. As explained above, Ohio law defines drilling unit as the "minimum acreage on which one well may be drilled." Ohio Rev. Code § 1509.01(G). The acreage required to drill a well depends on several factors, including well depth. See Ohio Admin. Code 1501:9-1-04(C). For example, Ohio law at the time the Assignments were executed[2] required a drilling unit of at least twenty acres to drill a well from two thousand to four thousand feet deep and a drilling unit of at least forty acres to drill a well deeper than four thousand feet. Ohio Admin. Code 1501:9-1-04(C) (effective 1983).

Therefore, Plaintiff's ORRIs in drilling units are restricted by the limitations of those drilling units. The at-issue drilling units range in size from 20 to 208.4 acres. Doc. 47-1 at 34; 48-2; 67-1. The grant of ORRIs in the drilling units smaller than 40 acres contain a 4,000 feet depth restriction, well above the Utica Shale/Point Pleasant formation. Those ORRIs do not attach to oil and gas in the Utica Shale/Point Pleasant formation. However, the grant ORRIs in drilling units of

---

[2] The spacing regulations have since been amended. The Court applies the regulations as they existed at the time the Assignments were executed as those regulations would have controlled the parties' understanding of a drilling unit.

40 acres or more have no depth restriction and do attach to oil and gas in the Utica Shale/Point Pleasant formation.

**B.  Undrilled Acreage Exception**

The next question is whether the undrilled acreage exception limits the grant of ORRIs such that they do not attach to the oil and gas within the Utica Shale/Point Pleasant formation. The Assignments exclude from the grants of ORRIs "the undrilled acreage associated with the lease referenced and/or pooling agreement." Doc. 1-1 at 2; Doc. 1-2 at 2. The key phrase in need of interpretation is "undrilled acreage."

The best place to start is where the parties agree – what constitutes drilled acreage. Both Plaintiff and Antero[3] agree that the drilling units are "drilled" at least to the depth of the shallow vertical wells. *See* Doc. 48 at 9-10 (defining undrilled acreage as "all acreage that was not drilled as of the time the Assignments were executed, regardless of whether it was located outside of the surface boundaries of the shallow well drilling units or below the depth of the shallow wells."); Doc. 85 at 15 ("it is well settled acreage contained within the drilling unit itself is 'drilled' . . . .").

The point of contention is to what extent the geographic strata within the drilling units constitutes undrilled acreage.  Antero asserts that the geographic strata below the shallow wells is undrilled acreage because no well reached it at the time of the Assignments. Doc. 72 at 21. It follows that because the Utica Shale/Point Pleasant formation is below the shallow wells, the portion of that formation within the drilling units constitutes undrilled acreage for purposes of the Assignments. The undrilled acreage exception would then exclude the Utica Shale/Point Pleasant formation from Plaintiff's ORRIs.

---

[3] Gulfport presented no argument on the meaning of the undrilled acreage exception.

Plaintiff argues that the phrase undrilled acreage cannot be construed as containing a depth limitation. Doc. 85 at 14. In support, Plaintiff relies on both the common meaning of "acreage" and industry practice. It argues that acreage is a "two-dimensional unit of measurement of the surface of land, not a reference to geological formations." *Id.* at 15. In addition, it argues that caselaw shows that in the oil and gas industry, acreage is drilled when there is a producing well of any geological depth. *Id.* at 14.

Plaintiff fails to persuade the Court. Plaintiff is correct that the common meaning of the word "acreage" taken in isolation means a two-dimensional area of land. The Merriam-Webster dictionary defines "acreage" as "area in acres." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/acreage, (last accessed June 30, 2023). "Area" is defined as "the surface included within a set of lines." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/area, (last accessed June 30, 2023). But acreage must be interpreted within the context of the Assignments. The Assignments exclude "undrilled acreage associated with the lease referenced and/or pooling agreement." Depth is an inherent consideration in oil and gas leases and pooling agreements. *See* Decl. of Pooling & Consolidation, Doc. 47-2 (permitting pooling oil and gas leases "for all formations from the surface down to the base of the Gordon formation."). It reasonably follows that because the Assignments spoke of acreage associated with oil and gas leases and pooling agreements, which inherently involve depth, that acreage was understood to refer to not only surface area, but also depth.

Plaintiff's argument that the oil and gas industry use the phrase undrilled acreage to refer only to surface area also fails. It first supports its position by citing to *Marshall v. Beekway Co.*, 27 N.E.3d 1 (Ohio 4th Dist. 2015) and *McWreath v. Majoca*, 2014 Ohio Misc. LEXIS 23671. Both cases involved a matter of oil and gas lease interpretation. The leases contained a clause which

extended the lease term past a primary period only if oil and gas continued to be produced in paying quantities. *Marshall*, 27 N.E.3d at 5; *McWreath* 2014 Ohio Misc. LEXIS 23671 at *9. The courts were tasked with determining whether the leases expired with respect to deep mineral rights where only shallow mineral rights were produced. *Marshall*, 27 N.E.3d at 5-6; *McWreath*, 2014 Ohio Misc. LEXIS 23671 at *1. The courts found that the leases did not distinguish deep mineral rights from shallow mineral rights, therefore the production of either extended the lease with respect to all mineral rights. *Marshall*, 27 N.E.3d at 5-6; *McWreath*, 2014 Ohio Misc. LEXIS 23671 at *9.

These cases are readily distinguishable from the case at bar. Interpreted generously, they stand for the proposition that absent specific language to the contrary, an oil and gas field is produced as to all depths whenever a well is producing to any depth. Here, unlike the leases in *Marshall* and *McWreath*, the Assignments contain language to the contrary. The Assignments contain a specific clause excluding "undrilled acreage." As explained above, the undrilled acreage exclusion can be understood as excluding undrilled surface area and strata. Neither case suggests an alternative meaning of undrilled acreage.

Next, Plaintiff cites to *Neuhart v. Transatlantic Energy Corp.*, 121 N.E.3d 802 (7th Dist. 2018). In *Neuhart*, an oil and gas lease was accompanied by a letter providing that undrilled acreage would revert to the property owner in the event that three wells were not drilled on the property by the end of the primary term. *Id.* at 804. Three wells were not drilled on the property within the required time frame. *Id.* The court found the letter to be a Pugh clause – a provision which permits land governed by an oil and gas lease to be divisible – and that under the Pugh clause, the undrilled acreage automatically reverted to the landowner. *Id.* at 807.

11

*Neuhart* does little to advance Plaintiff's position. It does use the phrase undrilled acreage, but it does not specify whether the undrilled acreage was undrilled surface area or both surface area and strata. Moreover, the *Neuhart* court interpreted a Pugh clause within an oil and gas lease. Here, the Court is interpreting an Assignment of ORRIs which does not contain a Pugh clause.

Two additional considerations buttress Antero's belief that the geographic strata deeper than the shallow vertical wells is undrilled acreage. First, a reading of the entire grant commands this conclusion. The Assignments first grant ORRIs then limit the scope of that grant through the undrilled acreage exception. If all earth within the drilling unit were considered drilled, the undrilled acreage exception would fail to limit any of the grant, rendering the exception meaningless. Some portion of the drilling units must therefore be considered undrilled. As the parties agree that the portion of the drilling units in which the vertical shallow wells are placed are drilled, the only earth which could be considered undrilled is the strata within the drilling units and below the shallow vertical wells.

Second, as a practical matter, the plain purpose of the undrilled acreage exclusion is to limit the ORRIs from future oil and gas production. Production of oil and gas within the Utica Shale/Point Pleasant formation, which was not foreseen when the Assignments were executed, comfortably fits the purpose of the undrilled acreage exception.

Therefore, the Court agrees with Antero and finds that undrilled acreage means the surface area and geographic strata which was not drilled at the time of the Assignments. As the drilling units were drilled up to the depth of the vertical shallow wells, the only undrilled acreage within the drilling units is the geographic strata below the depth of the respective vertical shallow well.

## IV.    Conclusion

In sum, the Court finds that the Assignments granted Plaintiff ORRIs in drilling units in relation to the limits of those drilling units imposed by Ohio law. The ORRIs in drilling units are further limited by the undrilled acreage exception, which limits them to the depths of their respective shallow vertical well. As none of the shallow vertical wells reach the oil and gas Defendants' deep horizonal wells are producing out of the Utica Shale/Point Pleasant formation, Plaintiff's ORRIs do not attach to that oil and gas.

Plaintiff's Motion for Summary Judgement, Doc. 67, is **DENIED** and Defendants' motions for summary judgment, Docs. 64 and 72, are **GRANTED**. The Clerk shall enter final judgment in favor of Defendants.

**IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: July 21, 2023